# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JASON T. PROCKNOW,

                Plaintiff,

                v.                              Case No. 04-C-872

STEVEN SCHUELER, GARY R. McCAUGHTRY,
CHARLIE BROWN, BETH LIND, CHAPLAIN WITCH,
STANLEY TONN, JAMES MUENCHOW,
MARK REINKE, OFFICER PASSIG, OFFICER LOWERY,
JOHN RAY, CINDY O'DONNELL, MATTHEW J. FRANK,
CURT JENNSEN,[1] SERGEANT McCARTHY,
SERGEANT BAUER, and JOHN DOES 1-3,

                Defendants.

---

ORDER GRANTING THE DEFENDANTS' MOTIONS FOR LEAVE TO FILE EXCESS
PAGES (DOCS. ##42 and 82), GRANTING THE DEFENDANTS' MOTION FOR AN
EXTENSION OF TIME (DOC. #40), DENYING THE PLAINTIFF'S MOTION FOR
ADDITIONAL ACCESS TO LAW LIBRARY (DOC. #62), GRANTING THE PLAINTIFF'S
MOTION FOR AN EXTENSION OF TIME (DOC. #62), GRANTING THE PLAINTIFF'S
MOTION FOR LEAVE TO FILE EXCESS PAGES (DOC. #67), GRANTING THE
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. #43) AND ORDERING
THAT THE CLERK OF COURT ENTER JUDGMENT DISMISSING THE PLAINTIFF'S
CLAIMS AND THIS ACTION.

        The plaintiff, Jason T. Procknow, is proceeding in this *pro se* civil rights action

pursuant to 42 U.S.C. § 1983 claiming that the defendants have violated his rights under the

First and Eighth Amendments as well as the Religious Land Use and Institutionalized Persons

Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc-1(a), et. seq. The following matters must be

decided: (1) the defendants' two motions for leave to file briefs with excess pages; (2) the

defendants' motion for an extension of time to seek summary judgment; (3) the plaintiff's

---

[1]Curt Jennsen has been identified as Curtis Janssen. (*See* February 15, 2006, Affidavit of Curtis
Janssen).

motion for additional law library access; (5) the plaintiff's motion for extension of time to respond to the defendants' motion for summary judgment; (5) the plaintiff's motion for leave to file a responsive brief with excess pages; and (6) the defendants' motion for summary judgment.

## DEFENDANTS' MOTIONS FOR LEAVE TO FILE EXCESS PAGES

The defendants have filed a motion for summary judgment and have requested leave to file supporting and reply briefs with excess pages. (*See* Docs. #42 and #82). Civil Local Rule 7.1(f) (E.D. Wis.) provides, in pertinent part:

> Except by permission of the Court, principal briefs on motions must not exceed 30 pages and reply briefs must not exceed 15 pages, exclusive of pages containing the statement of facts, the proposed findings of fact as required by Civil L.R. 56.2, and affidavits, but inclusive of headings and footnotes.

The defendants' brief in support of their motion for summary judgment is 79 pages long and their reply brief runs 37 pages. In support of their requests, the defendants assert that it was necessary to exceed the page limits set forth in the Local Rules because the claims at issue are "fact intensive" and "required lengthy legal analysis." (D.s' Feb. 15, 2006, Mot. for Leave to Submit Brief Which Exceeds the Page Limit as Set Forth in Civil L.R. 7.1(f) at 1; D.s' June 1, 2006, Mot. for Leave to Submit Brief Which Exceeds the Page Limit as Set Forth in Civil L.R. 7.1(f) at 1). Inasmuch as this is a fact intensive matter as the defendants contend, the motions will be granted.

## DEFENDANTS' MOTION FOR EXTENSION OF TIME

On September 26, 2005, the court issued a scheduling order setting the deadline for dispositive motions as February 13, 2006. Subsequently, on February 9, 2006,

the defendants filed a motion for an extension of time in which to file a motion for summary judgment. Fed.R.Civ.P. 6(b) states in relevant part:

> When by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged if request therefor is made before the expiration of the period originally prescribed or as extended by a previous order. . . .

As grounds for her request, counsel for the defendants states that an enlargement of time was necessary due to her demanding caseload. (D.s' Mot. for a Rule 6(b) Enlargement of Time to File Their Motion for Summary Judgment and Brief at 1). The court is satisfied that the reasons underlying the defendants' request justify an extension of time. Accordingly, the defendants' motion will be granted.

### PLAINTIFF'S MOTION FOR ADDITIONAL ACCESS TO LAW LIBRARY

On February 27, 2006, the plaintiff filed a motion seeking "access to the law library computers or . . . the books required by law to be provided and are not currently being provided to the plaintiff." (Pl.'s "Motion to Make WCI Give Me Access to the Law Library or Provide Me with Necessary Legal Research Materials and Extension of Time to Respond to Summary Judgment Motion" at 1). The defendants respond that prison officials have complied with the plaintiff's request for legal research materials.

The court construes the plaintiff's request as a motion for injunctive relief. In deciding whether to grant a motion for a temporary restraining order or preliminary injunction, the court considers (1) whether the moving party has an adequate remedy at law; (2) whether he will suffer irreparable harm if the preliminary injunction is not issued; (3) whether the irreparable harm he will suffer if the preliminary injunction is not granted outweighs the

3

irreparable harm the defendant will suffer if the injunction is granted; (4) whether he has a reasonable likelihood of prevailing on the merits; and (5) whether the injunction will not harm the public interest. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). The moving party's threshold burden is to establish the first and second factors and to show "some likelihood of success on the merits." *Ping v. National Educ. Ass'n*, 870 F.2d 1369, 1371 (7th Cir. 1989) (emphasis in original); *see also Roth v. Lutheran General Hosp.*, 57 F.3d 1446, 1453 (7th Cir. 1995). If the plaintiff satisfies the initial three-step burden, the court must balance the irreparable harm to the nonmoving party if the injunction is granted against the irreparable harm to the moving party if the injunction is denied. *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997). Also, the court must consider the effect of the injunction of nonparties. *Id*.

For several reasons, the plaintiff has failed to show that he is entitled to injunctive relief. First, he has not demonstrated a likelihood of success on the merits of his claim. To establish a denial of his constitutional right, an inmate must show that the prison had deficient legal facilities and that he was hindered in his efforts to pursue a particular legal claim. *See Lewis v. Casey*, 518 U.S. 343, 351 (1996); *see also Alston v. Debruyn*, 13 F.3d 1036, 1040-41 (7th Cir. 1994) (holding that inmate must establish: (1) the failure of prison officials to assist in the preparation and filing of meaningful legal papers; and (2) some quantum of detriment caused by the challenged conduct). Even if the inmate can establish an "absolute deprivation of access to all legal materials," his claim will fail absent identification of some injury linked to the deprivation. *Lewis*, 518 U.S. at 353 n.4.

4

In this case, the plaintiff claims that he is not permitted to use the law library computers to conduct legal research. The plaintiff is banned from using the computers because he was found guilty of misusing the HSC computer in June 2005. (Mar. 14, 2006, Letter from Atty. Moua, Ex. 2). Also, he has no constitutional right to conduct electronic legal research. *See*, *i.e., Campbell v. Miller*, 787 F.2d 217, 229 (7th Cir. 1986)(Alone, delay and inconvenience do not rise to a constitutional denial of access to the courts). Further, the defendants have submitted records entitled "HSC Court Deadline Daily Legal Recreation" sheets showing the legal materials the plaintiff has requested and received. (*See* Mar. 14, 2006, Letter of Atty. Moua, Ex. 4). These records reveal that between January 4, 2006, and February 27, 2006, the plaintiff filed at least 42 requests for legal research material and was provided in excess of 150 cases. *Id.* The plaintiff has not explained how these materials were insufficient to meet his legal research needs.

Second, the plaintiff has not shown that he has suffered an injury as a result of the alleged wrongdoing. Indeed, on March 28, 2006, the plaintiff filed an 80-page response to the defendants' motion for summary judgment which contains over 50 exhibits and dozens of case citations. (*See* Pl.'s Response to D.s' Mot. for Summary Judgment). In light of the foregoing, the plaintiff has failed to meet his burden of showing that injunctive relief is warranted. Hence, his motion for additional access to the law library will be denied.

## PLAINTIFF'S MOTION FOR EXTENSION OF TIME

On February 27, 2006, the plaintiff filed a motion for an extension of time in which to file a response to the defendants' motion for summary judgment. A review of the docket in this case reveals that the defendants filed their motion for summary judgment on

5

February 15, 2006. Pursuant to Civil L.R. 7.1(a) (E.D. Wis.), the plaintiff's response to the defendants' motion was due on or before March 17, 2006. However, he did not file his response until March 28, 2006, and he has not given any indication why he filed a belated response. On the other hand, the court notes that the defendants' brief in support of their motion was quite lengthy and included 15 affidavits. Moreover, the plaintiff's brief was filed soon after it was due. Thus, there is justification for the requested extension of time. Therefore, the plaintiff's motion will be granted.

## PLAINTIFF'S MOTION FOR LEAVE TO FILE EXCESS PAGES

On March 28, 2006, the plaintiff filed a motion for leave to file excess pages in his response to the defendants' motion for summary judgment. As grounds for his request, the plaintiff states that additional pages were necessary to respond to the defendants' brief. Again, the court notes that the defendants' brief in support of their motion for summary judgment was quite lengthy and contains numerous affidavits. Thus, it is reasonable to believe that plaintiff needed additional pages to respond to the defendants' submission. Consequently, the plaintiff's motion to file excess pages shall be granted.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I. BACKGROUND OF THE CASE

On September 13, 2004, the plaintiff lodged a civil rights complaint against defendants Steven Schueler, Gary R. McCaughtry, Sergeant Hilbert, Charlie Brown, Beth Lind, Chaplain Witch, Stanley Tonn, James Muenchow, Mark Reinke, Officer Passig, Officer Lowery, John Ray, Cindy O'Donnell, Sandy Hautamaki, Matthew J. Frank, Curt Jennsen, Sergeant McCarthy, Sergeant Bauer and John Does 1-3. The court screened the complaint

on April 28, 2005, and the plaintiff was permitted to proceed on claims under the First and Eighth Amendments as well as RLUIPA.

On February 15, 2006, the defendants filed a motion for summary judgment which is fully briefed and ready for disposition.[2]

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id*. For the fact to be material, it must relate to a dispute that "might affect the outcome of the suit." *Id*.

Although summary judgment is a useful tool for isolating and terminating factually unsupported claims, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986), courts should act with caution in granting summary judgment, Anderson, 477 U.S. at 255. When the

---

[2]By letter of June 8, 2006, the plaintiff complains that he was unable to "respond to [his] response brief." (Pl.s' Letter of June 8, 2006, at 1). Specifically, he objects to "newly submitted materials that [he] did not have a chance to respond to in [his] response brief." *Id*. On motions for summary judgment, the Local Rules provide that the movant may serve a reply brief with necessary affidavits within 15 days of service of the response. Civil L.R. 7.1(c) (E.D. Wis.). Further, review of the defendants' reply brief reveals that it responds directly to the plaintiff's allegations as raised in his response brief. For example, the plaintiff claims in his response brief that Conduct Report 1670749 has been overturned. (Pl.s' Response to D.'s Mot. for Summary Judgment at 5). In their reply, the defendants assert that Conduct Report 1670749 is valid and had not been overturned. (D.'s Reply in Support of Mot. for Summary Judgment at 3). Thus, a further response from the plaintiff with respect to this issue is unnecessary.

evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied. *Id*. at 248.

The moving party bears the initial burden of demonstrating that he is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323. Where the moving party seeks summary judgment on the ground that there is an absence of evidence to support the nonmoving party's case, the moving party may satisfy its initial burden simply by pointing out the absence of evidence. *Id*. at 325. Once this initial burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. *Id*. at 323-24. Neither party may rest on mere allegations or denials in the pleadings, *Anderson*, 477 U.S. at 248, or on conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (1989).

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, it is "not required to draw every conceivable inference from the record - only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991).

### III. RELEVANT UNDISPUTED FACTS

**A.    Preliminary Matters**

The facts at issue must be established through documents that ensure reliability and veracity, such as depositions, answers to interrogatories, admissions and affidavits. *Martz v. Union Labor Life Ins. Co.,* 757 F.2d 135, 138 (7th Cir. 1985). A prisoner plaintiff can demonstrate the veracity of a complaint by swearing under penalty of perjury that his

8

statements are true.  *See* 28 U.S.C. § 1746.  If the complaint is sworn, it will be treated as an affidavit at the summary judgment stage.  *Ford v. Wilson*, 90 F.3d 245, 246 (7th Cir. 1996).  However, submissions which are unverified and unsworn cannot be considered affidavits for the purposes of summary judgment motions because these documents would not be admissible at trial.  *See* Fed. R. Civ. P. 56 (c) and (e).  For this reason, the facts in this section are taken from the complaint and the plaintiff's affidavit of March 28, 2006, as well as the defendants' affidavits and exhibits.

By letter of April 6, 2006, the defendants state that they did not receive copies of all the exhibits attached to the plaintiff's response to their motion for summary judgment. Specifically, they maintain that they did not receive exhibits 1012 through 1039, 1043, 1061, 1067 through 1099, 1113 through 1115, 1117, 1123, 1128 through 1166, 1169, 1171 through 1179, and 1181 through 1189, nor did they receive the affidavits of John Burns, Kenneth Hare and Paul Hendler.  (Affidavit of Ma Manee Moua ¶2).  In response, the plaintiff avers that he is referencing exhibits attached to his June 21, 2005, reply brief in support of his motion for preliminary injunction.  Further, he submits that many of the exhibits that the defendants claim are missing do not exist.

Fed.R.Civ.P. 5 provides in pertinent part:

**(a) Service:** When required.  Except as otherwise provided in these rules . . . every pleading subsequent to the complaint unless the court otherwise orders because of numerous defendants . . . shall be served upon each of the parties.

A review of the plaintiff's response to the defendants' motion for summary judgment reveals that the plaintiff has attached to his response brief the affidavits of the following individuals: John A. Babcock, Idris Imani, John Anderson and Johnnie Burns.  (*See*

9

Pl.s' Response to D.s' Mot. for Summary Judgment).  Additionally, the following exhibits are attached: 1000-1013, 1112, 1116, 1118-1127, 1167, 1168, 1170, 1180, 1190, 1040-1042 and 1044-1066.  *See id.*  Thus, it appears that the plaintiff failed to comply with Fed.R.Civ.P. 5(a) when he neglected to provide the defendants with exhibits 1012 and 1061.  Further, it does not appear that these exhibits were attached to the plaintiff's reply brief in support of his motion for preliminary injunction. Consequently, exhibits 1012 and 1061 will be disregarded. However, the affidavits of John Burns, Kenneth Hare and Paul Hendler were attached to the plaintiff's reply brief in support of his motion for preliminary injunction and will be considered.

The plaintiff has requested that the court dismiss without prejudice his claim that the defendants harassed him for being Jewish and retaliated against him for receiving a kosher diet.  (Pl.s' Response to D.s' Mot. for Summary Judgment at 6).  In addition, he wishes to dismiss defendants Reinke, Passig, Bauer, Lowery, McCarthy and John Does 1-3.  *Id.*  In support of his request, the plaintiff states that he wants to present this issue in a separate lawsuit which he currently cannot do because he is "still addressing some of these issues in state court."  *Id*.  The defendants do not object to dismissal of these claims but request that the plaintiff's claims be dismissed with prejudice.

The record in this case reveals that the defendants have invested significant time and resources in defending against this action.  They have filed lengthy briefs, conducted interviews and submitted numerous affidavits along with their motion for summary judgment.  Further, the court can think of no reason why it would be necessary that the plaintiff file another lawsuit addressing the same claims involved in the present action.  Hence, dismissal of the plaintiff's harassment claim without prejudice is inappropriate and unfair to the defendants.  Therefore, the court will address the merits of this claim.

10

An initial comment is necessary with respect to the plaintiff's Conduct Report 1670749, which the defendants have submitted in support of their contention that the plaintiff does not have a sincerely held religious belief in Judaism. The plaintiff argues that the conduct report should be disregarded because it contains hearsay, it has been overturned and it concerns events that occurred after this lawsuit was filed on September 13, 2004. (Pl.'s Response to D.s' Mot. for Summary Judgment at. 5).

Conduct Report 1670749 documents the investigation that Bruce Muraski (who is not a named defendant) conducted concerning the November 26, 2003, incident in which the plaintiff claims that he found a note inside his sandwich that read "ENJOY YOUR SPIT KIKE." (Affidavit of Bruce C. Muraski [Muraski Aff.] ¶4, 7; Compl. at 6). A "true and correct copy" of the conduct report, which runs 37 pages in length, is attached to Muraski's Affidavit as Exhibit 1009. (Muraski Aff. ¶4). Muraski is employed at WCI as a Gang Coordinator and Investigator as well as Supervising Officer 2. (Muraski Aff. ¶2). He was asked to investigate the alleged threatening notes that several Jewish inmates, including the plaintiff, claimed to receive. (Muraski Aff. ¶4).

Parts of the conduct report are cited by the defendants in their proposed findings of fact to verify "what happened" with respect to the plaintiff's RLUIPA and First Amendment claims. In that regard, some of the proposed facts are not based on first-hand knowledge and therefore, constitute hearsay. *See* Fed. R. Evid. 801(c). For example, proposed findings of fact 369 to 370 relate to Conduct Report 1339895 which the plaintiff received after drawings of lightning bolts and swastikas were found in his cell. (Muraski Aff. ¶¶64-65; Ex. 1009 at 10). Muraski's report states:

11

The third CR reviewed was #1339895 written on 1-24-03 at Columbia Corr. Inst. This report states [the plaintiff] was in possession of 1 page of drawings which included lightning bolts and swastikas, symbols known to be used by white supremacists.

*Id*.

The Federal Rules of Evidence contain several hearsay exceptions, including the following business records exception:

The following are not excluded by the hearsay rule, even though the declarant is available at a witness:

\*\*\*

Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of regularly conducted business activity, and if it was the regular practice of the business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term 'business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Fed.R.Evid. 803(6). In *Wheeler v. Sims*, 951 F.2d 796, (7th Cir. 1992), the Court of Appeals for the Seventh Circuit applied a five-part test for admissibility under the exception. A document is admissible in evidence if: (1) the acts recorded therein were reported by a person with knowledge; (2) it was the regular practice of the prison as a regularly conducted business activity to record such acts; (3) the acts were recorded at or near the time of their occurrence; (4) the documents are properly authenticated; and (5) "unless the source of information or the method or circumstances or preparation indicate lack of trustworthiness." *Id*. at 802 (quoting Fed. R. Evid. 803(6)).

12

Conduct Report 1670749 satisfies all five parts of the test. While it may appear that there is a question as to whether the fifth prong is met (because it was prepared by a prison official), the court notes that the conduct report was not prepared by a named defendant who faces potential liability, nor does it constitute a self-serving statement. *See Bracey v. Herringa*, 466 F.2d 702, 705 (7th Cir. 1972)(documents held inadmissible were "prison records which included the self-serving statements of the defendants themselves as well as statements of other prison guards who were subject to possible Civil Rights Act liability.").

As to plaintiff's claim that all the events recorded in Conduct Report 1670749 took place after he filed this lawsuit, he is incorrect. As noted, the conduct report recounts an incident in 2003 in which the plaintiff was found to have lightning bolts and swastikas in his possession. Moreover, the events in the conduct report that took place after the plaintiff initiated this action (interviews of inmates Mandel, Corder and recording of the plaintiff's conversation with his mother), were investigatory and concern the alleged harassment claim that is the subject of this lawsuit. Finally, contrary to the plaintiff's assertion, the defendants have submitted evidence that the conduct report was not overturned and is valid. (*See* Supplemental Affidavit of Rebecca J. Kutzke ¶7). For these reasons, the court will not disregard the information presented in Conduct Report 1670749.

## B.  Relevant Undisputed Facts

The plaintiff was incarcerated at Waupun Correctional Institution (WCI) at all times relevant. (Complaint [Compl.] at 2). Gary McCaughtry, who is now retired, was the Warden of WCI when the alleged wrongdoing occurred. (Affidavit of Gary McCaughtry

13

[McCaughtry Aff.] ¶3, 8).  Charles M. Brown was employed as the WCI Food Service Administrator at all times relevant.  (Affidavit of Charles M. Brown [Brown Aff.] ¶2). Pam Fuller was employed as an Offender Records Supervisor.  (Affidavit of Pam Fuller [Fuller Aff.] ¶1).

### 1. WCI Defendants

Steven Schueler is a Supervising Officer 2 whose working title is Program Captain.  (Affidavit of Steven Schueler [Schueler Aff.] ¶2). Beth Lind is employed as a Food Services Manager.  (Affidavit of Beth Lind [Lind Aff.] ¶2).  Jamyi Witch is employed as a Chaplain.  (Affidavit of Jamyi Witch [Witch Aff.] ¶2). Stanley R. Tonn is employed as a Buildings and Ground Supervisor.  (Affidavit of Stanley R. Tonn [Tonn Aff.] ¶2).[3]  James Muenchow is employed as an ICE.  (Affidavit of James Muenchow [Muenchow Aff.] ¶9). Curtis Janssen is employed as a Supervising Officer 2 and his working title is Captain. (Affidavit of Curtis Janssen [Janssen Aff.] ¶3).[4]

### 2. DOC Defendants

Matthew J. Frank is the DOC Secretary.  (Affidavit of Matthew J. Frank [Frank Aff.] ¶2). John Ray is employed as a Corrections Complaint Examiner (CCE).  (Affidavit of John Ray [Ray Aff.] ¶2).  From August 17, 1998, to April 3, 2004, Cindy O'Donnell was employed as the DOC Deputy Secretary.  (Affidavit of Cindy O'Donnell [O'Donnell Aff.] ¶2). From April 4, 2004 to May 22, 2004, defendant O'Donnell was an Assistant Administrator for the DOC Division of Adult Institutions (DAI).  *Id.*

### 3. WCI Health and Segregation Complex

---

[3]Prior to holding this position, defendant Tonn was employed as an Inmate Complaint Examiner (ICE) from September 8, 2002, to August 7, 2004.  (Tonn Aff. ¶3).

[4]Prior to April 10, 2005, defendant Janssen worked as a first shift Corrections Program Supervisor for the Health and Segregation Complex and his working title was Unit Manager.  *Id.*

The plaintiff has alleged that the defendants prevented him from possessing various religious materials and publications. (Compl. at 1). Since arriving at WCI in July 2003, the plaintiff has been housed in the Health and Segregation Complex (HSC) due to violations of institution rules and regulations. (Schueler Aff. ¶9). Inmates in HSC have limited access to personal property items. (Witch Aff. ¶24). Property that is not allowed in segregation but is allowed in general population is stored in the property room. (Fuller Aff. ¶18). When an inmate is released from segregation, his property is returned to him. *Id*.

Upon his arrival at WCI, the plaintiff was placed in HSC and his personal property was recorded on a Property Inventory form DOC-236B. (Fuller Aff. ¶¶5, 6). The plaintiff's Property Inventory form DOC-236B noted that he had one Bible in his possession, which he was allowed to keep. (Fuller Aff. ¶¶7, 32; Ex. A).

### 4.    Kosher Meals

The plaintiff has claimed that the defendants failed to provide him with a proper kosher diet. (Compl. at 4). To ensure that incarcerated offenders have uniform opportunities to pursue the lawful religious practices of their religion, all DOC correctional institutions, including WCI, rely upon the guidelines set forth in Internal Management Procedure DOC IMP #6 "Religious Beliefs and Practices." (Witch Aff. ¶5; Feb. 2, 2006, Affidavit of Rebecca J. Kutzke [Kutzke Aff.] Exs. 1033-35). In addition, all DOC institutions, including WCI, rely on the guidelines set forth in Internal Management Procedure DOC 309 IMP 6B, "Religious Diets," (IMP 6B) to ensure that religious diets are available through standard menu alternatives. (Witch Aff. ¶6; Brown Aff. Ex. 1001; Affidavit of Christine A. Althaus [Althaus Aff.] ¶5). The standard menu alternatives for a kosher diet include foods such as fresh fruits and vegetables. (Althaus Aff. ¶6).

15

Christine Althaus, who is not a named defendant, is employed by the DOC as a dietician. (Althaus Aff. ¶¶2, 7). Althaus researched Jewish dietary laws and kosher requirements and she assisted in the development of IMP 6B relating to kosher diets. *Id.* Althaus relied on the *Manual of Clinical Dieticians* (6th ed.) when developing the kosher diet provisions in IMP 6B. (Althaus Aff. ¶8). The *Manual of Clinical Dieticians* sets forth guidelines to be used by dieticians to make a kosher diet available to those who choose to observe Jewish dietary laws in a non-kosher facility. (Althaus Aff. ¶11).

Based on the information she derived from the *Manual of Clinical Dieticians*, Althaus created a menu to meet basic kosher diet requirements, which are: (1) dairy products and meat products may never be eaten, served or cooked together; (2) pareve foods, such as eggs, fruit, grains, vegetables, coffee, tea and water, are neutral and may be used with meat or dairy foods; (3) kosher meat is that which comes from animals which both chew their cud and have split hooves, are slaughtered in the ritual manner that minimizes pain and drains off the blood, has been soaked for thirty minutes, salted for one hour, and washed three times thereafter; and (4) the kosher diet prohibits pork products, shellfish, catfish, wild birds and eggs with blood spots. (Althaus Aff. ¶12).

A kosher kitchen is one which has a designated area for meat-containing foods and a separate area for dairy foods. (Althaus Aff. ¶19). These separate areas require not only separate floor space, but separate storage space and separate equipment such as ovens and cooking utensils. *Id.* All DOC food service departments must work within their budget and space constraints, a task that is particularly challenging because most DOC institution kitchens are producing food for 150-200% of their planned capacities. *Id.* In addition, to

16

enlarge the kitchen areas would take away areas designed for bed and cell space. *Id.* Further, it would be necessary to train all kitchen staff on all three shifts to maintain a kosher kitchen. (Althaus Aff. ¶20).[5] Due to these concerns, it is not feasible for any DOC institution to maintain a separate kitchen for the preparation of kosher foods. (Althaus Aff. ¶19). In addition, it is not practical or feasible for DOC correctional institutions to have Jewish rabbis come to an institution on a daily basis to offer a "certification" of the kosher food by observing, inspecting and approving of the food preparation of each meal. (Althaus Aff. ¶21).

Kosher foods are available in packaged and processed foods that have been certified as kosher. (Althaus Aff. ¶13). For example, the following are examples of markings used to demonstrate that food is kosher:

a. **U** is copyrighted by the Union of Orthodox Jewish Congregations of American in New York, NY;

b. **VH** is copyrighted by Vaad Haroboim in Boston, MA;

c. **K** is copyrighted by Kashrus Laboratories in Brooklyn, NY;

d. **cRC** is copyrighted by the Chicago Rabbincal Counsel in Chicago, IL;

e. **MK** is copyrighted by the Montreal Vaad-Hair; and

f. **COR** is copyrighted by the Council of Orthodox Rabbis of Toronto

(Althaus Aff. ¶13).

_____

[5]The court is advised that it is common practice for DOC correctional institutions to employ inmate kitchen workers to prepare food. (Althaus Aff. ¶20). Further, it is unusual for such inmates to have any food service experience and teaching them the most basic food service sanitation requirements is challenging. *Id.*

Inasmuch as prison officials can purchase prepackaged kosher food, and maintaining a kosher kitchen and employing the daily services of a rabbi are unfeasible, the DOC correctional institutions are instructed to purchase foods that have been labeled as kosher to meet the requirements of the religious diet. *Id.*

WCI Food Services takes all necessary precautions to ensure that all canned, frozen and prefabricated purchased foods provided to inmates have a label indicating that they are kosher-approved food or produced under rabbinical supervision. (Brown Aff. ¶13). Currently, WCI does not serve any pork or pork by-products, and no such products been served at the institution in the last 10 years. *Id.* WCI Food Service takes all necessary precautions to ensure that milk, cheese or any other dairy-containing foods are not served as an ingredient, side dish or beverage with a meal containing meat, poultry or fish. (Brown Aff. ¶15). In addition, milk is not placed on the kosher lunch or dinner tray. *Id.* However, a full day's supply of nonfat dry skim milk is provided with the breakfast tray only. *Id.*

WCI Food Service takes all necessary precautions to ensure that disposable cookware, such as foil pans, tin foil and plastic wrap, was used to prevent contamination of kosher foods by non-kosher cooking utensils or equipment prior to the purchase of pots, pans and cooking utensils for kosher use only. (Brown Aff. ¶17). Disposable meal trays and utensils were used for serving kosher diet meals prior to the purchase of insulated meal trays for kosher use only. *Id.* These new trays have always been stored and washed separately and are not used for regular food. *Id.*

WCI follows the procedures set forth in the DOC Food Service Manual and DOC IMP 6B when preparing and heating kosher meals. (Brown Aff. ¶18). Pursuant to DOC IMP

18

6B, WCI wraps the sealed prefabricated kosher meals in saran wrap and heats the meal in a steamer. *Id.* WCI takes great care in ensuring that the meals do not leak during the cooking process and that the seal remains intact. *Id.* Prepared kosher meals or single service containers are served unopened or they are opened in the presence of the inmate. (Brown Aff. ¶19).

On October 19, 2003, the plaintiff submitted a signed DOC 2167 form indicating that his religious dietary requirements included a kosher diet. (Witch Aff. ¶12). Defendant Witch approved the plaintiff's request that same day and submitted the request to WCI Food Service. (Witch Aff. ¶12; Brown Aff. ¶7). The plaintiff began to receive a kosher diet on October 23, 2003. (Witch Aff. ¶13). On December 9, 2003, the plaintiff was taken off the kosher diet at his own request. (Brown Aff. ¶25; Witch Aff. ¶19).

On December 1, 2003, defendant Tonn received from the plaintiff Inmate Complaint Number WCI-2003-39836. (Tonn Aff. ¶11; Muenchow Ex. 1026 at 1). The complaint stated that the plaintiff was being subjected to harassment from HSC staff because he was on a kosher diet. *Id.* On December 12, 2003, Tonn rejected the complaint because this issue had been addressed earlier through the plaintiff's prior ICRS complaints. *Id.*

Defendant McCaughtry was aware that the plaintiff had complaints concerning the preparation and handling of his kosher food. (McCaughtry Aff. ¶9). Although McCaughtry had general supervisory authority over WCI operations, he did not supervise the day to day operations of food services, including the handling of the plaintiff's kosher food. (McCaughtry Aff. ¶12). Rather, McCaughtry designated the responsibility of providing religious diets to defendant Brown, the WCI Food Services Administrator. (McCaughtry Aff. ¶12).

19

In his capacity as DOC secretary, defendant Frank had no direct supervisory control over WCI food services. (Frank Aff. ¶6). In addition, Frank had no involvement in the approval, processing or handling of the plaintiff's kosher diet. *Id.* Further, Frank had no personal contact with the plaintiff. *Id.*

Defendant Witch had no involvement in the preparation or handling of the plaintiff's kosher foods or meal trays. (Witch Aff. ¶14). Moreover, she had no involvement in the choice of menu items that were provided to the plaintiff. (Witch Aff. ¶15). These duties are performed by the WCI Food Services Unit. *Id.* In addition, defendant Janssen had no involvement in the plaintiff's request for a kosher diet nor did he have any involvement in the preparation, processing or handling of the plaintiff's meals or food tray. (Janssen Aff. ¶7).

Defendant Schueler was aware that the plaintiff had complaints about his kosher diet. (Schueler Aff. ¶¶16-17). Although Schueler had supervisory authority over the HSC segregation units, Schueler did not supervise the day to day operations of food services or the preparation and handling of the plaintiff's kosher diet. (Schueler Aff. ¶¶16-17). Further, Schueler had no involvement in the approval of the plaintiff's religious diet request and did not interfere or retaliate against the plaintiff because of his kosher diet or religious beliefs. (Schueler Aff. ¶17).

Schueler is not aware that any staff under his supervision subjected the plaintiff to any harassing or demeaning behavior related to his religion. (Schueler Aff. ¶19). If he was aware of any such behavior, Schueler would have considered it a violation of work rules, and would have initiated the disciplinary process against the staff involved. *Id*.

20

### 5.    Religious Materials

The plaintiff has argued that the defendants have denied him various "articles of faith." (Compl. at 8). While in HSC, the plaintiff is only allowed to possess in his cell a copy of the Torah. (Schueler Aff. ¶29). He is not allowed to possess a Tzitzit (a fringed garment), a Yarmulke (skull cap), a Talus (prayer shawl), a Tephilin (arm wrap worn at morning prayers), a Talmud (holy book) nor any other prayer book or religious publication. *Id.*

On December 16, 2003, defendant Muenchow received Inmate Complaint Number WCI-2003-41390, contending that the plaintiff was denied certain religious materials while he was housed in HSC. (Muenchow Aff. 18; Ex. 1028). The plaintiff alleged that he was not permitted to possess a Tzitzis, a Yarmulke, a Tephilin, a Talus, the Talmud and prayer books. (Fuller Aff. 23; Ex. 1028 at 3). Muenchow investigated the complaint and recommended that it be dismissed. (Muenchow Aff. 19; Ex. 1028 at 3). Upon receiving the ICE's recommendation to dismiss the complaint, McCaughtry decided that the plaintiff's complaint did not justify a change in administrative practice as to religious property allowed in HSC. (McCaughtry Aff. ¶20). Thus, he dismissed the complaint. *Id.*

On or about January 20, 2004, defendant Ray received a "Request for Corrections Complaint Examiner Review" related to Inmate Complaint Number WCI-2003-41390. (Supp. Ray Aff. ¶10; Muenchow Aff. Ex. 1028 at 5-6). Upon his review of the ICE's report, Ray recommended that the complaint be dismissed. (Supp. Ray Aff. ¶11; Muenchow Aff. Ex. 1028 at 8).

On or about January 20, 2004, defendant O'Donnell received a CCE report related to Inmate Complaint Number WCI-2003-41390. (O'Donnell Aff. ¶11; Muenchow Aff.

21

Ex. 1028 at 8). On February 1, 2004, O'Donnell accepted Ray's recommendation to dismiss the complaint. (O'Donnell Aff. ¶12; Muenchow Aff. Ex. 1028 at 9). O'Donnell's only involvement in the plaintiff's allegation that he was denied religious materials was in the course of performing her duties as deputy secretary. (O'Donnell Aff. ¶13). Her decision regarding the disposition of the plaintiff's complaint was based upon her knowledge of the DOC administrative rules as well as DOC security concerns. (O'Donnell Aff. ¶14).

Defendant Janssen does not recall the plaintiff making a written request to him for a Tzitzit, Yarmulke, Talus, Tephilin, Talmud or any other prayer book or religious publications, nor does he recall talking to the plaintiff about his ability to obtain these items. (Janssen Aff. ¶10). Janssen was not aware that the plaintiff wanted these religious property items until he was informed of the complaint. *Id.*

Defendant Schueler does not recall the plaintiff making a written request to him for a Tzitzit, Yarmulke, Talus, Tephilin, Talmud or any other prayer book or religious publications, nor does he recall talking to the plaintiff about his ability to obtain these items. (Schueler Aff. ¶28). However, Schueler does recall that the plaintiff wanted various religious property in his cell, in addition to his Torah. *Id.* The plaintiff's religious materials were denied because of his HSC status. (Schueler Aff. ¶35)

Defendant Witch has no involvement in determining the allowable property items for an inmate to have in his cell while in HSC. (Witch Aff. ¶25). Witch did not deny any religious materials to the plaintiff based on his religious beliefs. (Witch Aff. 27).

22

### 6.	Publications

The plaintiff has averred that he was denied "Publications, books Magazines [and] Newspapers" while in HSC.  (Compl. at 9).   On September 16, 2003, defendant Tonn received Inmate Complaint Number WCI-2003-31305 in which the plaintiff complained about the policy of not allowing inmates in HSC to have publications such as books, newspapers and magazines.  (Tonn Aff. ¶18; Ray Aff. ¶8 Ex. 1004 at 1).  After conducting an investigation of the complaint, Tonn recommended that it be dismissed.  (Tonn Aff. ¶19; Ray Aff. Ex. 1004 at 10).

Upon receiving the ICE's recommendation to dismiss the complaint, McCaughtry determined that the complaint did not justify a change in administrative policy.  (McCaughtry Aff. ¶31; Ray Aff. Ex. 1004 at 6).  Thus, on October 9, 2003, McCaughtry accepted the ICE's recommendation to dismiss the complaint.  (Ray Aff. Ex. 1004 at 6).

On October 24, 2003, defendant Ray received the plaintiff's appeal of Inmate Complaint Number WCI-2003-31305. (Ray Aff. ¶10; Ex. 1004 at 7-8).  Ray noted that the complaint was dismissed by defendant McCaughtry on October 9, 2003, but that the plaintiff did not appeal within 10 days as required under Wis. Admin. Code § DOC 310.13(1).  (Ray Aff. ¶11; Ex. 1004 at 10).  Thus, Ray recommended that the complaint be dismissed as untimely.  (Ray Aff. ¶12; Ex. 1004 at 10).

On or about October 25, 2003, defendant O'Donnell received the CCE report dismissing the appeal of Inmate Complaint Number WCI-2003-31305 as untimely.  (O'Donnell Aff. ¶17; Ray Aff. Ex. 1004 at 10).  That same day, O'Donnell accepted the CCE's decision to dismiss the complaint.  (O'Donnell Aff. ¶18; Ray Aff. Ex. 1004 at 11).

23

Defendant Schueler does not have any record of the plaintiff requesting from him any publications, magazines, newspapers or books. (Schueler Aff. ¶37). Further, Schueler did not deny the plaintiff any publications, magazines, newspapers or books because of the plaintiff's religious beliefs. (Schueler Aff. ¶43).

### 7. Conditions of Confinement

The plaintiff has claimed that the noise in HSC caused him to miss meals and showers and gave him headaches. (Compl. at 11). WCI enforces regulations regarding unnecessary noise made by inmates in the HSC housing unit. (Schueler Aff. ¶5; Fuller Ex. B at 3). No kicking or pounding on doors or engaging in disturbing activities is allowed. *Id.* In addition, HSC regulations advise inmates that there may be no talking down range between the hours of 9:00 p.m. and 6:00 a.m. (Janssen Aff. ¶15).

HSC regulations also instruct inmates who use electronics that headphones must be worn at all time and that there is to be no yelling, whistling, loud noises or any horseplay-type activities. (Janssen Aff. ¶16). Inmates who are found to be noncompliant with the noise restrictions in the HSC housing are first warned to comply with noise regulations and then issued conduct reports. (Janssen Aff. ¶19).

Loud speaker announcements are made to advise all HSC inmates of approaching events such as meal deliveries, medication passes, or out of cell recreation times. (Schueler Aff. ¶54). Depending on the noise level in the HSC housing units, the loud speaker may not be heard. *Id.* For this reason, a loud buzzer is set off to warn inmates of an impending announcement. *Id.*

24

To receive meals, an inmate must be dressed at the door and have his light on. (Schueler Aff. ¶55). If the inmate is not at the door trap to receive the meal, it is considered a meal refusal. *Id.* In the event an inmate refuses a significant number of meals, the Health Services Unit (HSU) is notified. *Id.*

Showers are available to inmates on a regular schedule, which includes Sundays and Wednesdays after the breakfast meal. (Schueler Aff. ¶55; Fuller Aff. Ex. B at 15). All inmates, including the plaintiff, are aware of this schedule. *Id.* If the plaintiff wanted to take a shower, he would need to stand at his cell door and give a verbal response to the staff that he wanted to take a shower during the scheduled times. *Id.*

In 1999 or 2000, WCI installed padded baffles on both sides of the HSC wings in an attempt to reduce the level of noise created by unruly inmates. (Schueler Aff. ¶57). These baffles consist of 1 inch acoustical tiles padded with a noise reduction foam material covered in fabric. *Id.* The baffles were installed on both sides of dividers that run down the center of the wings. *Id.* In addition, inmates are allowed to possess a set of earplugs which may be purchased from the canteen or provided free of charge upon a determination of medical necessity. (Schueler Aff. ¶53).

On August 25, 2003, the plaintiff filed Inmate Complaint Number WCI-2003-28978 claiming that his housing unit was noisy and that he was subjected to constant yelling, screaming, kicking and pounding. (Muenchow Aff. ¶22; Ex. 1029). Defendant Muenchow conducted an investigation of the complaint and sent a copy of it to defendants Schueler and Janssen so that they would be aware of the plaintiff's charges about excessive noise and take

25

any necessary action.  (Muenchow Aff. ¶23; Ex. 1029 at 3).  On September 2, 2003, Muenchow recommended that the complaint be dismissed with modification.  *Id.*

Subsequently, on October 24, 2003, defendant Ray received a "Request for Corrections Complaint Examiner Review" of Inmate Complaint Number WCI-2003-28978. (Supp. Ray Aff. ¶14; Muenchow Aff. Ex. 1029 at 5-6).  After reviewing the report prepared by the ICE, Ray recommended that the complaint be dismissed.  (Supp. Ray Aff. ¶15; Muenchow Aff. Ex. 1029 at 8).  At no time was Ray aware that the plaintiff was subjected to a substantial risk that the excessive noise in HSU has or could cause him serious harm.  (Ray Aff. ¶17).

On or about October 24, 2003, defendant O'Donnell, as deputy secretary, received a CCE report related to Inmate Complaint Number WCI-2003-28978.  (O'Donnell Aff. ¶21; Muenchow Aff. Ex. 1029 at 8).  O'Donnell accepted the CCE's dismissal of the complaint on October 26, 2003.  (O'Donnell Aff. ¶22; Muenchow Aff. Ex. 1029 at 9).  This was O'Donnell's only involvement in the plaintiff's allegations related to the level of noise in the HSC.  (O'Donnell Aff. ¶¶23-24).  At no time was she aware that the plaintiff was subjected to a substantial risk that the noise level in HSC has or could cause the plaintiff serious harm. (O'Donnell Aff. ¶25).

On January 5, 2004, the plaintiff filed Inmate Complaint WCI-2004-1457, in which he asserted that his housing unit was so noisy that he could not hear the intercom announcements for recreation time, showers and meals.  (Muenchow Aff. ¶22; Ex. 1030).  On January 15, 2004, defendant Muenchow rejected the complaint because it did not raise a significant issue.  (Muenchow Aff. ¶26; Ex. 1030 at 3-4).   On January 30, 2004, defendant McCaughtry reviewed the rejection of the complaint and determined that it was rejected appropriately by defendant Muenchow.  (Muenchow Aff. Ex. 1030 at 7).  At no time was

26

McCaughtry aware that the plaintiff was subjected to a substantial risk that the noise in his housing unity caused or could have caused him serious medical harm. (McCaughtry Aff. ¶41).

On February 3, 2004, defendant Muenchow received Inmate Complaint WCI-2004-4649, in which the plaintiff complained that his housing unit was too noisy and that staff did not comply with the institution rule of no talking after 9:00 p.m. (Muenchow Aff. ¶29 Ex. 1031). On February 10, 2004, Muenchow rejected the complaint on ground that the issue raised has been addressed in Inmate Complaint WCI-2003-28978. (Muenchow Aff. ¶30 Ex. 1031 at 3). This rejection was not appealed by the plaintiff to the appropriate reviewing authority. (Muenchow Aff. ¶31).

Defendant Muenchow's only involvement in the plaintiff's claim related to excessive noise in HSC during the course of performing his duties as ICE. (Muenchow Aff. ¶32). At no time was Muenchow aware that the plaintiff was subjected to a substantial risk that the noise in HSC caused or could have caused him serious medical harm. (Muenchow Aff. ¶33).

During the times defendant Schueler was making rounds in the plaintiff's housing unit, he observed inmates who disregarded the HSC regulations concerning excessive noise. (Schueler Aff. ¶48). Schueler has instructed HSC staff to write conduct reports to those inmates who refuse to abide by the rules and does not recall the plaintiff requesting a set of earplugs. (Schueler Aff. ¶49). However, he does recall having conversations with the plaintiff related to the plaintiff's concerns about the level of noise in his housing unit. (Schueler Aff. ¶56). On the other hand, Schueler is unaware whether staff

27

refused to take the plaintiff to the shower area after he requested a shower or whether the plaintiff refused so many meals that it was necessary to call the HSU. *Id.*

WCI inmates are encouraged to take part in out of cell exercise opportunities because exercise is useful in increasing an inmate's body temperature, circulation, as well as overall physical and mental fitness. (Schueler Aff. ¶59). Out of cell exercise opportunities are offered to inmates in one hour time increments for up to four hours of exercise per week, time permitting. (Schueler Aff. ¶60).

The out of cell recreation areas are approximately 9' x 12' and have an open window that allows air from the outside in. (Schueler Aff. ¶61). In winter months, the air is cold in the recreation area. (Schueler Aff. ¶61). Due to the cold temperatures, all inmates are provided with coats. *Id.* Inmates are not provided with hats and gloves because these would need to be separately issued to each inmate for sanitary purposes. *Id.* If the out of cell recreation area is too cold for the plaintiff, he can choose to exercise in his cell. *Id.* Once a week, the out of cell recreation areas are mopped and scrubbed. (Schueler Aff. ¶63). If required, the areas are cleaned more than once a week. *Id.*

In addition to participating in out-of-cell recreation, inmates are encouraged to exercise regularly within their cells. (Schueler Aff. ¶65; Fuller Aff. Ex. B at 5-8). Inmates are provided with samples of exercises that can be performed in cell with no special equipment. *Id.*

On December 22, 2003, defendant Muenchow received Inmate Complaint Number WCI-2003-41795 in which the plaintiff claimed that the recreation areas in the HSC are smaller than the inmates' cells, they are dirty and inmates are not provided with adequate

28

clothing. (Muenchow Aff. ¶36; Ex. 1032). Muenchow conducted an investigation regarding the complaint and on January 15, 2004, recommended that the complaint be dismissed. (Muenchow Aff. ¶37 Ex. 1032 at 3). Muenchow's only involvement in the plaintiff's allegation concerning out of cell recreation was in the course of performing his duties as ICE. (Muenchow Aff. ¶39).

Defendant McCaughtry's only involvement with the plaintiff's claim concerning out of cell recreation was in the disposition of Inmate Complaint Number WCI-2003-41795. (McCaughtry Aff. ¶43; Muenchow Aff. Ex. 1030 at 1). Upon receiving Muenchow's recommendation of dismissal, defendant McCaughtry found that the plaintiff's allegations did not warrant changing the administrative practice related to out of cell recreation in HSC. (McCaughtry Aff. ¶44; Muenchow Aff. Ex. 1030 at 4).

On or about January 20, 2004, defendant Ray received a "Request for Corrections Complaint Examiner Review" for Inmate Complaint Number WCI-2003-41795. (Ray Aff. ¶19; Muenchow Aff. Ex. 1032 at 5-6). Upon his review of the report prepared by the ICE, Ray recommended that the complaint be dismissed. (Supp. Ray Aff. ¶20; Muenchow Aff. Ex. 1032 at 8).

On or about January 20, 2004, defendant O'Donnell received a CCE report related to Inmate Complaint Number WCI-2003-41795. (O'Donnell Aff. ¶27; Muenchow Aff. Ex. 1032 at 8). On February 8, 2004, O'Donnell accepted the CCE's recommendations and recommended that the complaint be dismissed. (O'Donnell Aff. ¶28; Muenchow Aff. Ex. 1032 at 9).

29

### 7.  Sincerity of the Plaintiff's Religious Beliefs

On November 26, 2003, the plaintiff found a note inside a sandwich that was delivered on his kosher meal tray.  (Muraski Aff. ¶7; Compl. at 5).  The note was written on a folded piece of wax paper and said "ENJOY YOUR SPIT KIKE."  (Compl. at 6).  Prison officials took pictures of the note and two slices of bread and recorded the event in Incident Report # 873115.  (Muraski Aff. ¶8; Ex. 1010).

Subsequently, on March 24, 2005, another Jewish inmate housed in HSC complained to prison officials that he had been harassed for being Jewish.  (Muraski Aff. ¶¶14-17).  Garrett Mandel, who is an Orthodox Jew, reported to HSC staff that he received a note in his Fast of Esther bag which stated "You will pay kike."  (Muraski Aff. Ex. 1009 at 5).  Then, on April 6, 2005, prison officials received Inmate Complaint Number WCI-2005-12705 in which inmate Mandel alleged that his cell had been trashed and he had been threatened by supervisors that his mandatory release date would be extended if he did not blame the plaintiff for placing the note in his Fast of Esther bag on March 24, 2005. (Muraksi Aff. Ex. 1013).

Due to the plaintiff and inmate Mandel's complaints about being harassed for observing a kosher diet, defendant Muraski was asked to conduct an investigation regarding the incidents.  (Muraski Aff. ¶4).  Muraski found that Mandel did not write Inmate Complaint Number WCI-2005-12705.  (Muraski Aff. ¶21).  Further, the complaint appeared to be in the plaintiff's handwriting.  (Muraski Aff. ¶20).  Also, Mandel indicated that prison officials did not place the note in his Fast of Esther bag.  (Muraski Aff. ¶¶24-25).  Rather, inmate Lewis Corder was responsible for placing the note in the bag.  (Muraski Aff. Ex. 1009; Ex. 1017).  Finally,

Case 2:04-cv-00872-CNC   Filed 10/25/06   Page 30 of 52   Document 97

Muraski's investigation revealed that Scott Jereska, a former WCI employee, was likely responsible for placing the note in the plaintiff's sandwich. (Muraski Aff. ¶45).

During the course of his investigation, defendant Muraski reviewed the plaintiff's Social Services file. (Muraski Aff. ¶48). The file contained two Religious Preference forms signed by the plaintiff. *Id.* The first form was signed and completed July 25, 2002. *Id.* The photocopy of this document indicates that the plaintiff originally marked the box "No Preference." (Muraski Aff. Ex. 1018). However, the form was later altered in blue ink to mark the plaintiff's religious preference as "Jewish." (Muraski Aff. ¶¶48-50).

The plaintiff's second Religious Preference form was signed on October 18, 2003. (Muraski Aff. Ex. 1019). The plaintiff's religious preference is listed as "Jewish." *Id.* However, the plaintiff also marked the box stating "This is the first time I have filled out this form." *Id.*

Defendant Muraski's investigation also revealed that on May 17, 1996, the plaintiff received Conduct Report #733410 for possessing white supremacist material. (Muraksi Aff. ¶¶57-58). Specifically, the plaintiff had saved on a computer an electronic copy of a pamphlet entitled "*The Hate Prophecies 'One Nation Under the Jew*.'" (Muraksi Aff. Ex. 1020 at 3). In addition, the plaintiff had in his possession a description of why he was currently incarcerated, which states in part: "he 'kicked the knife out of the Jews hand . . . Has (he - [the plaintiff]) bent down to grab the knife the Jew tried to tackel (sic)' him." (Muraski Aff. Ex. 1020). As a result, on May 17, 1996, the plaintiff was found guilty of Wis. Admin. Code §§ DOC 303.24 (Disobeying Order); 303.27 (Lying); and 303.36 (Misuse of State or Federal Property). *Id.*

31

Then, on January 24, 2003, the plaintiff received Conduct Report #1339895 for being in possession of one page of drawings of lightning bolts and swastikas. (Muraski Aff. Ex. 1021). The plaintiff was found guilty of possession of contraband on February 7, 2003. *Id*.

During Muraski's investigation, the plaintiff's phone calls were monitored. (Muraski Aff. ¶66). On January 10, 2005, the plaintiff called his mother, Kris Ernst, at telephone number 715-943-2326. *Id.* The relevant portion of their conversation follows:

> **Plaintiff:** Who knows, maybe if I win my lawsuit . . . I'm going to help you score your money, maybe get you 50-60 thousand in grants and maybe give you that much in start-up money. . . . Maybe I can get you a couple of hundred thousand.
>
> **Mother**: That would be OK; if nothing else we can start a catering business.
>
> **Plaintiff**: Yah, I'll tell you about that some day.
>
> **Mother**: Good or bad?
>
> **Plaintiff**: It's funny.
>
> **Mother**: Is that what you are now?
>
> **Plaintiff**: What's that?
>
> **Mother**: Jewish.
>
> **Plaintiff**: (Laughs).
>
> **Mother**: Got it, since when.
>
> **Plaintiff**: (Laughs). Couple of months.

(Ex. 1022-24).

Based on the foregoing, defendant Muraski concluded that the plaintiff orchestrated the harassment incidents at WCI. (Muraski Aff. ¶5). Thus, on June 3, 2005, the plaintiff was issued Conduct Report #1670749 which charged him with violating Wis. Admin. Code § DOC 303.32(c) (Enterprises and Fraud); 303.35 (Damage or Alteration of Property); and 303.271 (Lying About Staff). (Muraski Aff. ¶6; Ex. 1009 at 1). The plaintiff was found guilty of Conduct Report #1670749 on June 6, 2006. ([Kutzke Aff.] ¶6). The conduct report was appealed and the ICRS found several procedural errors, but it has not been overturned. (Kutzke Aff. ¶9).

The plaintiff has claimed that he has been accepted by a number of Jewish organizations, including the Aleph Institute, the Lubavitcher House and Michigan City Jewish Prisoners' Outreach. (Pl.'s Response to D.s' Mot. for Summary Judgment at 5). The Aleph Institute is a national, not-for-profit publicly supported charitable organization. (Affidavit of Menachum M. Katz [Katz Aff.] ¶2). The Aleph Institute's Prison Programs helps prisons meet the needs of Jewish inmates and creates and implements a host of highly-acclaimed programs for Jews who are isolated due to incarceration. (Katz Aff. ¶3).

Rabbi Menachum M. Katz has been employed as the Aleph Institute's Director of Prison Program for the past 12 years. (Katz Aff. ¶5). As the Director of the Prison Program, Rabbi Katz corresponds with and supervises rabbi visits to hundreds of state and federal prisons and jails across the United States. (Katz Aff. ¶6). Katz also supervises the prisoner applications for membership with Aleph. (Katz Aff. ¶8). After an application is submitted, the Aleph Institute contacts the relative or family listed on the application to verify the accuracy of the information. (Katz Aff. ¶9).

33

In 2004, the plaintiff applied for membership in the Aleph Institute. (Katz Aff. ¶12). The plaintiff provided the names of several family members who are allegedly Jewish. (Katz Aff. ¶¶13-16). However, Rabbi Katz has not been able to confirm whether the plaintiff is Jewish. (Katz Aff. ¶17).

## IV. ANALYSIS

The defendants argue: (1) the plaintiff failed to exhaust his administrative remedies with respect to his claim that he was denied publications, magazine and books; (2) the plaintiff's kosher diet claim is moot; (3) the plaintiff's kosher diet claim fails under RLUIPA and the First Amendment; (4) the plaintiff's religious materials claim fails under RLUIPA and the First Amendment; (5) the plaintiff's noise claim fails under the Eighth Amendment; (6) the plaintiff's recreation claim fails under the Eighth Amendment; and (7) the defendants are entitled to qualified immunity.

### A.    Exhaustion of Administrative Remedies

The defendants maintain that the plaintiff's claim that he was denied publications, books and magazines while in HSC should be dismissed because the plaintiff failed to exhaust his administrative remedies. In response, the plaintiff contends that he exhausted this claim because he raised this issue in Inmate Complaint Number WCI-2003-41390. (Pl.s' Response to D.s' Mot. for Summary Judgment at 47-48). The Prison Litigation Reform Act of 1995 (PLRA), Pub. L. 104-134, 110 Stat. 1321 (1996), provides that

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

34

42 U.S.C. § 1997(e)a.

Exhaustion of administrative remedies is a condition precedent to suit. *Dixon v. Page*, 291 F.3d 485, 488 (7th Cir. 2002) (citing *Perez v. Wis. Dep't of Corrs.*, 182 F.3d 532, 535 (7th Cir. 1999)). Section 1997e applies to "all inmate suits, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The Inmate Complaint Review System (ICRS) within the Wisconsin prisons is the administrative remedy available to Wisconsin inmates with complaints about prison conditions or the actions of prison officials. Wis. Admin. Code § DOC 310.01(2)(a). The Wisconsin Administrative Code provides that before an inmate may commence a civil action, the inmate shall exhaust all administrative remedies that the Department of Corrections has promulgated by rule. Wis. Admin. Code § DOC 310.05. The ICRS is available for inmates to "raise significant issues regarding rules, living conditions, staff actions affecting institution environment, and civil rights complaints." Wis. Admin. Code § DOC 310.08(1).

To use the ICRS, an inmate must file a complaint with the inmate complaint examiner with fourteen days after the occurrence giving rise to the complaint. Wis. Admin. Code §§ DOC 310.07(1) and 310.09(6). After reviewing and acknowledging each complaint in writing, the inmate complaint examiner either rejects the complaint or sends a recommendation to the "appropriate reviewing authority." Wis. Admin. Code §§ DOC 310.11(2) and 310.11(11). The appropriate reviewing authority makes a decision within ten days following receipt of recommendation. Wis. Admin. Code § DOC 310.12(1). Within ten days after the date of the decision, a complainant dissatisfied with a reviewing authority decision may appeal that decision by filing a written request for review with the corrections

35

complaint examiner. Wis. Admin. Code § DOC 310.13(1). The corrections complaint examiner reviews the appeal, and then makes a recommendation to the Secretary of the Department of Corrections. Wis. Admin. Code § DOC 310.13(6). The Secretary may accept, adopt, or reject the correction complaint examiner's recommendation, or return the appeal to the corrections complaint examiner for further investigation. Wis. Admin. Code § DOC 310.14(2).

In Inmate Complaint WCI-2003-31305, the plaintiff states that he was denied "newspapers, magazines and books in the HSC." (Ray Aff. Ex. 1004 at 1). On October 2, 2003, defendant Tonn recommended that the complaint be dismissed. (Ray Aff. Ex. 1004 at 10). Defendant McCaughtry affirmed Tonn's recommendation to dismiss the complaint on October 9, 2003. (Ray Aff. Ex. 1004 at 6). Subsequently, on October 24, 2003, the plaintiff appealed defendant McCaughtry's dismissal. (Ray Aff. Ex. 1004 at 7-8). However, defendant Ray dismissed the appeal as untimely. (Ray Aff. Ex. 1004 at 10).

Wisconsin Administrative Code provides that within ten days after the date of the decision, a complainant dissatisfied with a reviewing authority decision may appeal that decision by filing a written request for review with the corrections complaint examiner. Wis. Admin. Code § DOC 310.13(1). The PLRA exhaustion requirement requires "proper exhaustion," meaning that a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines. *Woodford v. Ngo*, 126 S. Ct. 2378, 2382 (2006); *see also Pozo v. McCaughtry*, 286 F.3d 1022, 1023 (7th Cir. 2002) ("To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require."). This, the plaintiff has failed to do.

36

The plaintiff contends that he exhausted his publications claim because he raised this issue in Inmate Complaint Number WCI-2003-41390. (Pl.s' Response to D.s' Mot. for Summary Judgment at 47-48). This inmate complaint indicates that the plaintiff is asserting that he was denied religious materials, not news publications. (*See* Fuller Aff. Ex. D). It does not establish that the plaintiff exhausted his administrative remedies with respect to Inmate Complaint Number WCI-2003-31305.

**B.    RLUIPA and First Amendment Claims**

The plaintiff contends that the defendants have prevented him from possessing religious items such as a tzitzis, talus, tephillin, talmud, prayer books, grape juice, challus rolls and religious publications. On the other hand, the defendants aver that the plaintiff's claims must fail under RLUIPA and the First Amendment because his professed beliefs in Judaism are not sincerely held.

RLUIPA prohibits governmental imposition of a "substantial burden on the religious exercise" of an inmate, unless the defendant can show that the burden is: (1) in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. § 2000cc-1(a). By contrast, a prison regulation challenged on First Amendment grounds will be upheld if it is reasonably related to a legitimate penological interest. *Lindell v. Frank*, 377 F.3d 655, 657 (7th Cir. 2004). Because the defendants have a heavier burden under RLUIPA, the court will first consider the plaintiff's statutory claim. If the defendants meet their burden under RLUIPA, they will meet the less stringent burden of establishing that their conduct was reasonably related to a legitimate penological interest under the First Amendment.

37

Before addressing the merits of the plaintiff's statutory claim, the protections afforded by the Religious Land Use and Institutionalized Persons Act apply where

> (1) the substantial burden is imposed in a program or activity that receives Federal financial assistance; or
>
> (2) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes.

42 U.S.C. § 2000cc-1(b). Because the DOC receives and uses federal grant money for state prison facilities, the requirements of the RLUIPA apply to it. *Lindell v. McCallum*, 352 F.3d 1107, 1109-10 (7th Cir. 2003)(citing *Charles v. Verhagen*, 348 F.3d 601, 606 (7th Cir. 2003)).

To show that his rights under RLUIPA were violated, the plaintiff must first establish that the defendants' actions create a substantial burden on the exercise of his religious beliefs. 42 U.S.C. § 2000cc-2(b); *Hernandez v. Commissioner*, 490 U.S. 680 (1989). The plaintiff's religious beliefs must be sincerely held to establish a protected right under RLUIPA. *See Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005)("Although RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion . . . the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity."). If a plaintiff makes a showing that his sincerely held religious beliefs have been substantially burdened, the defendant must come forward with evidence demonstrating that the burden furthers a "compelling governmental interest" and does so by "the least restrictive means." *Id.* at 715-16.

While RLUIPA does not define the term "substantial burden," the Court of Appeals for the Seventh Circuit has held that a substantial burden is "one that necessarily bears a direct, primary, and fundamental responsibility for rendering religious exercise . . .

38

effectively impracticable." *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003). Under the statute, a "religious exercise" is "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).

The plaintiff contends that his beliefs in Judaism are sincerely held inasmuch as: (1) he "got serious" about practicing Judaism in 1996; (2) he has never practiced any other religion while in DOC custody; and (3) he is Jewish by birth and has been accepted by a number of Jewish organizations. (Pl's Response to D.s' Mot. for Summary Judgment at 2-4). As to the plaintiff's assertion that he started to get serious about practicing Judaism when he arrived at Fox Lake Correctional Institution in 1996, the court notes that on at least two occasions since 1996 prison officials have found anti-Semitic materials in the plaintiff's possession. In addition, the plaintiff was found guilty of arranging to have anti-Semitic notes planted in his and another inmate's food. Further, it is undisputed that in January 2005, the plaintiff told his mother that he had been Jewish for a couple months.

With respect to the plaintiff's claim that he has never practiced any other religion while in DOC custody, it is undisputed that he had a Bible (and not a Torah) in his possession when he arrived at WCI. Moreover, the plaintiff has submitted the affidavit of one Paul Hendler, who states that the plaintiff has studied "other religions" during the twelve years he has known him. (Affidavit of Paul Hendler ¶2).

Finally, the plaintiff claims that he is Jewish by birth and has been accepted by various Jewish organizations. However, Rabbi Katz states that the plaintiff is not a member of the Aleph Institute. Nor was Katz able to confirm that the plaintiff is Jewish after he attempted on several occasions to contact members of the plaintiff's family.

39

*In Lindell v. Casperson*, 360 F.Supp.2d 932 (W.D. Wis. 2005), United States District Court Judge Barbara B. Crabb addressed the issue of assessing the sincerity of the plaintiff's religious beliefs at the summary judgment stage. Judge Crabb stated, in relevant part:

> I agree with the courts that have imported the *sincere* belief requirement into cases brought under RLUIPA. It makes no sense to say that a particular regulation imposes a burden of any kind, much less a substantial one, on a prisoner's exercise of his religion unless it is the prisoner's *sincere* beliefs that are at stake. If a prisoner is contending that he must have a plethora of apparently preposterous objects and opportunities in order to practice his religion and if his list of alleged necessities changes for no apparent reason, it is reasonable to infer that he is more interested in exercising his ability to tie up the courts and prison officials than in exercising his religion. Congress enacted RLUIPA to protect the rights of prisoners seeking to exercise their religious beliefs, not to protect prisoners who misuse the Act to make life as difficult as possible for their jailors.

*In Lindell,* the plaintiff claimed that he required special food, holy days, conjugal visits and special clothing to properly observe his religion. 360 F. Supp.2d at 952. In granting the defendants' motion for summary judgment, Judge Crabb held that the plaintiff failed to demonstrate that his religious beliefs were sincerely held because his requests were "inconsistent" and "ever changing." *Id.* For example, the plaintiff requested a religious diet of "spices, pork, horse flesh, walnuts, apples, honey, mead and cheese," yet he also requested a vegetarian diet. *Id.* Judge Crabb found that in light of these discrepancies, the plaintiff failed to meet his burden of showing that he had a sincerely held belief that he could not practice his religion without his requested diet. *Id.*

Similarly, the record in this case reveals a history of inconsistent requests and actions on the part of the plaintiff with respect to his allegation that he is Jewish. For

40

example, the complaint alleges that the plaintiff's exercise of religion was substantially burdened because he was denied tzitzis, talus, tephillin, talmud, prayer books, grape juice, challus rolls and religious publications. (Compl. at 8). However, the plaintiff later claims that "he is only asking for the essential religious items that are necessary to practice Judaism. These are items such as a 'Rams Horn' and 'Menorah.'" (Pl.'s Proposed Findings of Fact ¶18).

The plaintiff contends that the court should be wary in determining whether he has a sincerely held belief in Judaism. In support of his proposition, he relies on *Ochs v. Thalacker*, 90 F.3d 293, 296 (8th Cir. 1996), in which the plaintiff claimed that he was expressing a sincere religious belief when he requested to be housed only with inmates of his race. *Ochs,* however, does not stand for the proposition that a court should never inquire into the sincerity of the plaintiff's religious beliefs. Indeed, a close reading of *Ochs* indicates support for the proposition that courts have an obligation to "weed out" false religious claims that are actually attempts to "gain special privileges or disrupt prison life." 90 F.3d at 296.

In sum, the record in the present case is replete with evidence that the plaintiff does not have a sincerely held belief in Judaism. Moreover, it indicates that the plaintiff has engineered several events to harass prison officials and disrupt prison life. Thus, the plaintiff's RLUIPA claims must fail. Hence, the plaintiff is also precluded from prevailing on his First Amendment counts.

## C.  Harassment Claims

The plaintiff claims that defendants Witch, McCaughtry, Schueler, Brown, Lind, Janssen, Frank, Muenchow, Ray, O'Donnell, Reinke, Passig, and Stanley retaliated against

41

him for following a kosher diet. (Compl. at 5-6). In particular, he avers that the defendants: (1) referred to him as a "Jew Bastard," and made a variety of statements about him and Jews in general; (2) forced him to get on his hands and knees and bark like a dog to receive a meal tray; and (3) put a note in his sandwich that read "ENJOY YOUR SPIT KIKE." *Id.*

Prison officials may not retaliate against an inmate for exercising his First Amendment rights, even if their actions would otherwise be permissible. *Zimmerman v. Tribble*, 226 F.3d 568, 573 (7th Cir. 2000). To succeed on a retaliation claim, a plaintiff must show that he engaged in constitutionally protected behavior and that his behavior was a substantial or motivating factor in the defendants' negative treatment of him. *Rasche v. Village of Beecher*, 336 F.3d 588, 597 (7th Cir. 2003). However, merely alleging the ultimate fact of retaliation is insufficient. *Benson v. Cady*, 761 F.2d 335, 342 (7th Cir. 1985).

The plaintiff's retaliation claim concerns anti-Semitic statements that the defendants allegedly made in October and November 2003, concerning the plaintiff's kosher diet. (Compl. at 5-6). The court will now address this claim. Initially, there is a question as to whether the defendants made the statements the plaintiff has complained about. As noted earlier, the plaintiff was found guilty of arranging to have a threatening note placed in his food. Further, he has submitted no evidence that the defendants referred to him as a "Jew Bastard" or that they made him bark like a dog. Regardless, the plaintiff's retaliation claim fails for other reasons.

In this case, the plaintiff has not identified the alleged protected activity which caused the defendants to retaliate against him. He has not indicated that he filed a complaint and the defendants retaliated against him on that basis. *See Black v. Lane*, 22 F.3d 1395,

42

1401 (7th Cir. 1994)(retaliation against a prisoner for his use of the courts or of the administrative complaint system may give rise to a valid cause of action under § 1983). Nor has he alleged that he is being retaliated against for accessing the courts. *See id.*

It appears that the crux of the plaintiff's complaint is that the defendants threatened him because he received kosher food. For example, plaintiff states that the defendants "made lude comments about the 'Jew Bastard' who got the kosher tray." (Compl. at 5). However, simply indicating a preference for or receiving kosher food is not a constitutionally protected behavior. To support a claim of retaliation, the speech in question must relate to a matter of public concern and not to the speaker's own interests. *McElroy v. Lopac*, 403 F.3d 855, 858 (7th Cir. 2005); *Sasnett v. Litscher*, 197 F.3d 290, 292 (7th Cir. 1999).[6] In light of the foregoing, the facts underlying the plaintiff's retaliation claim fail to demonstrate that the defendants retaliated against him for engaging in a constitutionally protected activity. Therefore, the defendants are entitled to summary judgment on this claim.

## D. Eighth Amendment Claims

Next, the plaintiff claims that while in HSC he was subjected to extreme noise which resulted in the following: (1) headaches; (2) sleeplessness; (3) missed showers; and (4) missed meals. (Compl. at 13). In addition, the plaintiff asserts that he was denied adequate opportunities for out of cell recreation because: (1) he was not given clothes to protect him from the cold weather conditions; (2) the recreation cages are smaller than the

---

[6]Incidentally, there is also an issue as to whether the claimed constitutionally protected activity was truthful. Speech that is not truthful is not protected by the First Amendment. *McDonald v. Smith*, 472 U.S. 479, 484-85 (1985)(claims that are baseless and contain falsehoods do not enjoy constitutional protections).

43

HSC cells; and (3) the recreation cages are kept in an unsanitary condition. (Compl. at 12-13).

To make out an Eighth Amendment claim based on prison conditions, an inmate must show that he has suffered an objectively, sufficiently serious injury, and that prison officials inflicted the injury with deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). An objectively, sufficiently serious injury is one that deprives the inmate "the minimal civilized measure of life's necessities. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Only extreme deprivations will support an Eighth Amendment claim. *Delaney v. DeTella*, 256 F.3d 679, 683 (7th Cir. 2001). Prison officials are deliberately indifferent to deprivations suffered by inmates if they have knowledge of the condition but refuse to take steps to correct it. *Dixon v. Godinez*, 114 F.3d 640, 645 (7th Cir. 1997).

In this circuit, prison officials may violate an inmate's Eighth Amendment rights by subjecting him to excessive noise. *King v. Frank*, 328 F.Supp.2d 940, 946 (W.D. Wis. 2004). However, liability is imposed only when the defendants are deliberately indifferent to a substantial risk that the noise will case the inmate serious harm. *Id*.

### 1. Headaches and Sleeplessness

The plaintiff avers that he "wrote 3 inmate complaints about the notice and nothing was done" and submits that he suffered headaches and sleeplessness as a result of the noise levels in HSC. (Pl.'s Aff. ¶49). In response, the defendants aver that the plaintiff did not alert them to these conditions. In support of their proposition, the defendants point out that none of the plaintiff's three inmate complaints concerning noise mentioned that he had a headache or that he was unable to sleep.

44

Review of Inmate Complaint Numbers WCI-2004-1457, WCI-2003-28978, and WCI-2003-41795 reveals that the plaintiff did not file an inmate complaint alleging that the noise in HSC cause him to suffer sleeplessness and headaches.

Nevertheless, the plaintiff maintains that he has "written dozens of health service request (sic) complaining about [his] headaches." (Pl.s' Aff. ¶48). Exhibits 1046 to 1053 support this claim and indicate that he filed medical complaints stating that he suffered headaches. However, these medical complaints were directed to the Health Services Unit. None of the defendants named in the plaintiff's noise claim is a medical official to whom the plaintiff's complaints were directed. Therefore, the defendants were not alerted to the plaintiff's claims of headaches and sleeplessness.

The court is mindful that the plaintiff has charges that he told defendant Schueler on several occasions that he was experiencing headaches and sleeplessness. Notably, he has submitted no evidence in support of this proposition. On the other hand, the record establishes that the defendants installed baffling in 1999 or 2000 to reduce the noise level. In addition, inmates may purchase earplugs from the canteen or receive them from HSU if they have a medical need. HSC regulations provide that inmates may not talk down range between the hours of 9:00 p.m. and 6:00 a.m. and inmates caught breaking this rule are issued conduct reports.

The plaintiff avers that he is unable to obtain earplugs. (Pl.'s Response to D.s' Mot. for Summary Judgment at 55). Yet, he offers no admissible evidence in support of this assertion. He cites Exhibit 1040 to bolster his claim that his request for earplugs was denied. (Pl.'s Response to D.s' Mot. for Summary Judgment, Ex. 1040). However, Exhibit 1040 is a copy of another inmate's February 17, 2006, HSU request for earplugs. *Id*.

45

The plaintiff adds that he has "never really seen staff enforce the noise rule." (Pl.s' Aff. ¶47). However, it is unclear whether he has personal knowledge that prison officials do not issue conduct reports for noise violations. In light of the foregoing, the plaintiff has failed to set forth an Eighth Amendment violation. Thus, the defendants' motion for summary judgment will be granted as to this claim.

### 2. Missed Meals and Showers

The plaintiff asserts that the noise level in HSC was so loud that he missed the announcements for meals and showers. The defendants concede that they were aware that the plaintiff missed meals and showers due to the noise in HSC. However, they submit that they were never aware that the plaintiff had missed so many meals and showers that they knew he was suffering a sufficiently serious injury.

It is undisputed that to receive meals, an inmate must be dressed and present at the door of his cell with his light on. If the inmate fails to wait for his meal at the door trap, he behavior is considered to be a meal refusal. If an inmate refuses a significant amount of meals, the Health Services Unit is notified.

It is further undisputed that showers are available to all inmates on Sundays and Wednesdays after the breakfast meal. All inmates, including the plaintiff, are aware of this schedule. If an inmate desires to take a shower, he must stand at his cell door and give a verbal response to prison officials that he desires to take a shower during the scheduled times.

Here, the plaintiff has not indicated how many meals he has missed as a result of not hearing the announcements. And he has not rebutted the defendants' assertion that the Health Services Unit did not notify the defendants that the plaintiff had missed a

46

significant number of meals. Moreover, the plaintiff has not offered any evidence that he suffered any harm, such as weight loss, as a result of missing meals. Thus, the plaintiff has not demonstrated that he suffered a sufficiently serious deprivation. *See Delaney,* 256 F.3d at 683 (only extreme deprivations will support an Eighth Amendment claim).

With respect to the plaintiff's claim that he missed showers, he has failed to specify exactly how many showers he missed. Indeed, in *Davenport v. DeRobertis*, 844 F.2d 1310, 1316 (7th Cir. 1988), the Court of Appeals for the Seventh Circuit held that one shower per week is constitutionally permissible under the Eighth Amendment. Here, the plaintiff has not claimed that he showered less than once per week. Moreover, he has not indicated that he was unaware that showers were held on Wednesdays and Sundays after the breakfast meal. Therefore, the plaintiff has failed to demonstrate that he experienced a sufficiently serious deprivation. Consequently, the defendants' motion for summary judgment will be granted on this claim.

### 3. Recreation

The plaintiff charges that: (1) he was denied out of cell recreation; (2) he was forced to exercise in the cold; (3) the recreation areas were small and dirty; and (4) the lack of outdoor recreation aggravated his knee injury. (Compl. at 12-13). In response, the defendants aver that the plaintiff is provided several opportunities each week to exercise outside his cell, he was not forced to exercise in the cold, the recreation areas are not small and are cleaned on a weekly basis and the plaintiff has submitted no admissible evidence that his knee was injured as a result of being denied out of cell recreation.

47

The Court of Appeals for the Seventh Circuit has recognized that a lack of exercise can rise to a constitutional violation, *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1986); *Harris v. Fleming*, 839 F.2d 1232, 1236 (7th Cir. 1988). However, a constitutional violation occurs only "in extreme and prolonged situations where movement is denied to the point that the inmate's health is threatened." *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996). Opportunities to exercise that are merely less than desirable do not implicate this constitutional right. *See generally Caldwell v. Miller*, 790 F.2d 589, 601 (7th Cir. 1986)("Constitution does not mandate that prisons be comfortable"); *e.g., Harris*, 839 F.2d at 1236 (no violation where petitioner could have moved about his segregation cell by doing pushups, aerobics or jogging in place); *French,* 777 F.2d at 1255 (it is not a wanton and unnecessary infliction of pain to have to exercise in cramped quarters).

Inmates are provided out of cell recreation opportunities in one hour increments for a total of four hours per week. The recreation areas have an open window that allows air from the outside in. In winter months, it is cold in the recreation area. Inmates are not provided with hats and gloves because these would need to be separately issued to each inmate for sanitary purposes. If the out of cell recreation area is too cold for the plaintiff, he can choose to exercise in his cell. Inmates are provided with a list of exercises they may perform in their cell.

First, the plaintiff asserts that he was denied out of cell exercise opportunities. He has not rebutted the defendants' assertion that he was provided with approximately one hour of exercise per day for up to four hours per week. Nor has he indicated on how many occasions he was denied out of cell exercise. It is well settled that short term denials of

48

exercise may be inevitable in the prison context and are not so detrimental as to constitute a constitutional deprivation. *Thomas v. Ramos*, 130 F.3d 754, 764 (7th Cir. 1997)(70 day denial of exercise permissible); *Harris,* 839 F.2d at 1236 (28 day denial of exercise not deprivation); *Shelby County Jail Inmates v. Westlake*, 798 F.2d 1085, 1089 (7th Cir. 1986)(limited recreational activities sufficient where average prison stay was 10 days or less); *but see Antonelli,* 81 F.3d at 1432 (viable constitutional claim where prisoner was denied recreational opportunities for seven weeks); *Jamison-Bey v. Thieret*, 867 F.2d 1046, 1048 (7th Cir. 1989)(reversing summary judgment for prison officials where segregated prisoner was denied exercise for 101 days).

Next, the plaintiff contends that WCI's recreation cages are too small to exercise in. Specifically, he submits that the recreation cages are six feet by nine or ten feet at most. (Pl.'s Response to D.s' Mot. for Summary Judgment at 65). In response, the defendants offer that the recreation cells measure approximately nine feet by twelve feet. Regardless of the cell size, plaintiff has not explained why the recreation cells are too small to exercise in. That is, he has not indicated what types of exercise he has been prevented from performing due to the small size of the recreation cells. Moreover, the fact that the plaintiff may be forced to exercise in cramped quarters does not establish a constitutional violation. *French,* 777 F.2d at 1255.

The plaintiff also contends that the recreation cells are kept in an unsanitary condition. (Pl.'s Response to D.s' Mot. for Summary Judgment at 64). In support of his contention, he claims that he has only seen the recreation cage cleaned five or six times in

49

two years and nine months.  *Id*.  This does not negate the defendants averment that the HSC recreation cells are cleaned out on a weekly basis, if not more often.

The plaintiff further asserts that he is not provided with warm clothing to protect him from the cold when he goes out for recreation.  (Pl.'s Response to D.s' Mot. for Summary Judgment at 64).  However, the defendants' aver that inmates who participate in out of cell recreation are given coats to keep them warm.  Construing these facts in a light favorable to the plaintiff, he was provided with a coat which did not keep him warm when he used the recreation cage.  However, he is not required to use the recreation cage when it is cold and may exercise in his cell.  (Schueler Aff. ¶¶ 63-65)

Finally, the plaintiff avers that he has lost a substantial amount of muscle mass and that lack of exercise aggravated his knee injury.  (Pl.s' Response to D.s' Mot. for Summary Judgment at 66). In support of his claim, the plaintiff submits that he complained about his sore knee on August 12, 2003, August 23, 2003, June 30, 2005, July 7, 2005, September 7, 2005, October 31, 2005, December 6, 2005, December 8, 2005, January 5, 2006, and February 17, 2006.  (Pl.'s Response to D.s' Mot. for Summary Judgment at 62). A review of the documents the plaintiff has submitted in support of this contention reveals that in none of these complaints did he mention that a lack of exercise caused or aggravated his knee injury.  (See Pl.'s Exs. 1055–1066; Ex. 1050, 1054). Moreover, the plaintiff has not indicated that he can perform exercises in the recreation cage that he cannot preform in his cell.   Indeed, he asserts that the recreation cage is actually smaller than his cell. Furthermore, the plaintiff has presented no evidence that he has a knee injury or that it was aggravated by a lack of exercise. Thus, he has failed to establish that the defendants denied him opportunities for out of cell exercise.

50

### E.  Qualified Immunity

The defendants contend that they are entitled to qualified immunity with respect to plaintiff's claim that his mail from the federal court was opened outside his presence. However, when a court determines in a § 1983 case that no constitutional violation occurred, it is unnecessary to consider whether defendants are entitled to qualified immunity. *Phillips v. City of Milwaukee*, 123 F.3d 586, 597 (7th Cir. 1997)(citing *Kraushaar v. Lanigan,* 45 F.3d 1040, 1049 n. 4 (7th Cir. 1995)).  Thus, the defendants' qualified immunity argument warrants no further discussion.

For the reasons set forth above,

**IT IS ORDERED** that the defendants' motion for leave to file excess pages (Doc. # 42) is GRANTED.

**IT IS FURTHER ORDERED** that the defendants' motion for leave to file excess pages (Doc. #82) is **GRANTED.**

**IT IS ALSO ORDERED** that the defendants' motion for an extension of time (Doc. #40) is **GRANTED.**

**IT IS ORDERED** that the plaintiff's motion for additional access to the law library (Doc. #62) is **DENIED.**

**IT IS ORDERED** that the plaintiff's motion for an extension of time (Doc. #62) is **GRANTED.**

**IT IS ORDERED** that the plaintiff's motion for leave to file excess pages (Doc. #67) is **GRANTED.**

51

**IT IS ORDERED** that the defendants' motion for summary judgment (Doc. #43)

is **GRANTED.**   This case is dismissed and the Clerk of Court is ordered to enter judgment

accordingly.

Dated at Milwaukee, Wisconsin, this 25th day of October, 2006.

BY THE COURT


s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U.S. District Judge

52